**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SANDRA D. ROBINSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-06-4083 |
| | § | |
| HENRY M. PAULSON, | § | |
| SECRETARY OF THE TREASURY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

The plaintiff, Sandra D. Robinson, who is African-American, alleges that her former employer, the Internal Revenue Service, subjected her to a hostile work environment and discriminated against her. The defendant, Henry M. Paulson, Secretary of the United States Treasury, has moved to dismiss for lack of subject-matter jurisdiction or for summary judgment, (Docket Entry No. 36). Robinson has responded, (Docket Entry No. 39). Based on a careful review of the motion and response, the pleadings, the record, and the applicable law, this court denies the motion to dismiss Robinson's hostile work environment claims, grants the motion to dismiss Robinson's wrongful termination claim, and grants the defendant's motion for summary judgment on the hostile work environment and discrimination claims. Final judgment is entered by separate order.

The reasons for these rulings are explained below.

I.     **Background**

Robinson began working with the IRS in October 1990.  In January 1994, Robinson sustained an on-the-job injury when she fell off a chair.  She injured her shoulder, resulting in nerve "infringement" that caused back and neck pain.  (Docket Entry No. 36, Exs. 8, 13). Robinson was off duty for one year, returning to work in January 1995.  (Docket Entry No. 36, Ex. 13).

After the 1994 injury, Robinson submitted a claim with the Office of Worker's Compensation Programs (OWCP).  (Docket Entry No. 36, Ex. 3 at 2).  As a result of the claim, Robinson was placed on a work plan that included a four-hour workday, or twenty hours a week.  Robinson also filed a claim with the EEO asserting disability discrimination. The EEO claim and a subsequent grievance ended with her transfer to the position of Customer Service Representative, GS-962-08, for the Wage and Investment (W&I) Division walk-in service of the Internal Revenue Service in Houston, Texas.  (*Id.*).  This office responded to inquiries from taxpayers on a walk-in basis.  Robinson's duties were to provide taxpayers with information to enable them to file returns, make payments, and receive assistance electronically, and to take action as needed to resolve tax issues, including some delinquencies.  Robinson's daily tour of duty began at 12:30 p.m. and ended at 4:30 p.m. (*Id.*).

In January 2001, Kathleen Thacker became Robinson's immediate supervisor. Thacker's title was Field Assistant Manager for the Northwest/Southeast/Beaumont Tax Assistance Center (TAC).  (*Id.*).  Thacker had been with the IRS since 1991.  Thacker

reported to Mary E. Son, who was Robinson's second-level supervisor. Son's title was Field Assistant Territory Manager, Area 5. Thacker and Son are both Caucasian.

On May 24, 2001, Thacker conducted a group meeting with the Houston workgroup, including Robinson, about timekeeping and leave issues. (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 6). Before the meeting, employees who worked past the end of their daily tour of duty to help customers could only get credit or compensatory time in full-hour increments. That is, an employee had to work a full hour past the usual stopping time to get an hour of credit or compensatory time. (Docket Entry No. 36, Ex. 10, Testimony of Kathleen Thacker at EEOC Hearing at 162:1-11). This policy meant that employees who worked less than an hour over their schedules could not get credit time. Thacker felt that the credit time policy was not fair for those employees in the walk-in division who stayed late to assist a customer. (*Id.*, at 162:9-20). The policy also meant that Robinson could not receive credit time for working late; because her tour of duty was limited to four hours a day, she could not work a full extra hour as required to receive credit time. (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 7). Thacker revised the credit time policy, with approval from Labor Relations. (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 8). Thacker announced the new policy at the May 24, 2001 meeting. Thacker explained in her affidavit that she revised the credit time policy to accommodate the extra minutes that an employee had to work beyond his or her tour of duty to assist a customer. (*Id.* at 7). Thacker directed employees to log in any time they worked past their regular schedules if they had to stay late to serve a customer. (*Id.*). Thacker would track the extra time each employee recorded.

3

When a full hour was accumulated, the employee would receive one hour of credit time. (Docket Entry No. 36, Ex. 10, Testimony of Kathleen Thacker at EEOC hearing at 162:1-24). The employee could use the credit time to arrive late to work or leave early, but had to notify the manager in advance. (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 7). Because Robinson could not deduct a full hour from her four-hour workday, Thacker would allow her to record extra time she spent helping customers and to take credit time for that on a minute-by-minute basis, rather than waiting for a full hour to accumulate and taking time off in hourly increments. (*Id.*).

The May 24, 2001 meeting minutes included a statement from Son that the office was to remain open from 8:00 a.m. to 4:30 p.m. and that employees were prohibited from closing doors to customers before 4:30 p.m. (*Id.*).

On the same day, after the group meeting ended, Thacker and union steward Richard Perlman had a separate meeting with Robinson to discuss her pattern of reporting to work late. (Docket Entry No. 36, Ex. 8, Robinson Affidavit at 5). On some occasions, Robinson had come in late the day after she had stayed beyond 4:30 p.m. to assist a customer. (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 2-3). Robinson asserts that coming in late the next day was a common and accepted practice for an employee who stayed late to assist a customer. (Docket Entry No. 39, at 2). The defendant asserts that Robinson was not only persistently coming in late but was doing so without informing her manager, as required for all employees. (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 2-3).

In the meeting with Thacker and Perlman, Robinson explained that there had been no

guidelines in the past about how to get paid for time spent helping a customer after the end of the employee's scheduled tour of duty.  Thacker had announced the revised credit time policy for logging minutes in the group meeting.  In the meeting with Thacker and Perlman, however, Robinson said, "to avoid logging my minutes that I prefer to end my shift at 4:30 p.m."  (Docket Entry No. 36, Ex. 8, Robinson Affidavit at 5).  Thacker explained that Robinson could leave at the end of her shift if she chose to not use the log-in system, but that if she did not log extra work time, she could not receive any credit time.  (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 8).  According to Robinson, Thacker stated that if Robinson left every day at 4:30, that would affect critical elements of Robinson's job performance. (Docket Entry No. 36, Ex. 8, Robinson Affidavit at 5).  Robinson explained to Thacker her understanding that under the labor contract, this element could not be used in her evaluation. (*Id.*).  Thacker denies making this statement.  (Docket Entry No. 36, Ex. 14).  According to Thacker, Robinson could leave at the end of the day and not record extra time worked, but that meant she could not come in late or leave early based on having to work past her tour of duty.  The problem that developed, according to Thacker, was that Robinson did not want to log extra minutes but still wanted to report late without applying for and taking leave time if she got "caught past her tour of duty" the night before.  (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 8).  On one occasion after this meeting, Robinson acknowledged to Thacker that she had reported to work five minutes late but would work five to ten minutes late that day to make up the time.  (*Id.*).  Thacker allowed Robinson to do so, instead of marking Robinson as Absent Without Leave (AWOL) for that time.  (*Id.*).

5

Thacker asserts that after she agreed that Robinson did not have to stay past her tour of duty, Robinson left abruptly before the meeting ended and refused to talk to Thacker for the rest of the day. (Docket Entry No. 36, Ex. 14). Robinson disputes that she left the meeting in the middle. (Docket Entry No. 39, at 10-11). Robinson asserts that the meeting and the statements from Thacker are evidence of a hostile work environment.

Thacker issued Robinson a memorandum of counseling on June 6, 2001 entitled "Time and Attendance." (Docket Entry No. 36, Ex. 14). In the memo, Thacker chronicled Robinson's consistent tardiness, noting that occasionally arriving late and making up for the missed time at the end of the day was permitted, but not to the extent of making the practice a habit. (*Id.*). Thacker gave Robinson the option to change her tour of duty if necessary to enable her to report to work on time. Thacker's memo reminded Robinson that their jobs "require us to be on duty during core hours to assist customers who come in to be helped. You are already on a reduced work schedule and only work 20 hours a week. It is imperative that you report to work on time. Your attendance affects your coworkers schedules. When you do not arrive on time, especially during our busy time of the day, lunchtime, it makes it extremely difficult to fulfill our commitment to our customers and get coworkers timely lunches and/or breaks." (*Id.*). The memo stated that Robinson's repeated failure to follow her work schedule would result in AWOL charges for the time she missed and could even lead to her removal. (*Id.*). Thacker explicitly stated in the memo that Robinson would not be required to stay past her daily tour of duty but had to report to work on time each day. (*Id.*).

6

After receiving a memo from members of the work group complaining about understaffing and work load, Thacker held a group meeting on June 7, 2001 to talk about the issue. Thacker acknowledged that the office was understaffed and explained that this was a system-wide problem that she could not fix, but she disagreed that the work load was a significant problem. (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 5). Robinson stated that in the meeting, she told Thacker not to "get snippy with us." Robinson told Thacker that she did not know about the work load because she had only been the office manager for four months. (Docket Entry No. 36, Ex. 8, Robinson Affidavit at 4).

In the meeting, Thacker talked about several employees, including Robinson. Thacker talked about Robinson's conduct on May 29, 2001, when Robinson had locked the door to the walk-in service despite the fact that customers were waiting. (Docket Entry No. 36, Ex. 8, Robinson Affidavit at 4-5). Robinson responded that she did so because the office was "overly crowded with taxpayers" and she was the only employee on duty. (*Id.* at 4). Robinson said that she locked the door and told the waiting customers to come back in one hour, when her coworker would return from lunch. (Docket Entry No. 39, at 12). Thacker had received a report that on May 30, the office was short staffed and Robinson did not come into work until one-half hour past the start of her tour of duty. (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 4). In the June 7 meeting, Thacker told Robinson to stop locking the customer service door during the work hours between 8:00 a.m. and 4:30 p.m. Thacker told Robinson that locking the doors during working hours would affect her job performance evaluation. (Docket Entry No. 36, Ex. 8, Robinson Affidavit at 4). Robinson replied that the

issue was not covered under the Rules of Conduct and could not affect her performance and that she was "entering a violation of occupancy safety hazard allowing more customers to enter." (*Id.*).  Robinson stated that unless other employees were available to help, she would continue to lock the door during the work day, even if customers were present.  (Docket Entry No. 36, at 3).  In the brief she filed in this lawsuit, Robinson asserts that she locked the doors against customers because she was concerned for her safety: "I was alone at that Counter with no protection and no other employee there to at least run and get Help.  This event occurred three months before September 11, 201 when many Federal employees and soldiers died at the Pentagon.  There is still No mention of accommodations for my disability." (Docket Entry No. 39, at 12).  Robinson asserts that the accusation that she violated a work rule when she closed the doors for an hour is evidence of a hostile work environment.  (*Id.*).

According to Thacker, Robinson again left in the middle of the meeting and refused Thacker's request to speak with her privately.  According to Robinson, she left when the meeting was over and was not "required to Stay in the room until everyone else left." (Docket Entry No. 39, at 5).

On June 7, 2001, Thacker issued Robinson another memorandum of counseling. (Docket Entry No. 36, Ex. 15).  The memo referred to Robinson's departure from the May 24, 2001 meeting with Thacker and Perlman in the middle of the discussion and her refusal to speak with Thacker for the rest of the day.  (*Id.*).  The memo also referred to the May 29, 2001 incident in which Robinson locked the office doors to customers, stating that this action

was "unacceptable and unprofessional."  (*Id.*).  The memo warned Robinson that "further episodes of either the above nature could not only result in disciplinary action" but would also affect a critical element of her performance evaluation.  (*Id.*).

On June 8-10, 2001, a tropical storm caused severe flooding in the Houston area.  On Monday June 11, Robinson left Thacker a phone message stating that "due to the flood" she would not be at work.  (Docket Entry No. 39, at 5-6).  Thacker called employees to see if they were affected by the flooding.  When Thacker tried to call Robinson, her mother answered and said that Robinson had no flooding in her home but was helping her sister with flood problems and would call Thacker later.  (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 3).  This conversation was witnessed by Special Agent Peggy Schillinger of the Treasury Inspector General Tax Administration (TIGTA).  Robinson asserts that Thacker's call was harassment,  (Docket Entry No. 39, at 6); Thacker asserts that she called all employees to check on them after the flood,  (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 3).  Robinson asserts that having Schillinger listen was "harassment and hostile treatment," (Docket Entry No. 39, at 6); Thacker explained that she had Schillinger listen because she had had difficulties talking to Robinson in the past.  (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 3).

The next day, June 12, Robinson's mother called Thacker to say that Robinson would not be at work because she had a doctor's appointment.  (Docket Entry No. 36, Ex. 3 at 3-4).  The day after that, June 13, Robinson called and left Thacker a voicemail message stating that she would be off work "until further notice" due to her 1994 worker's compensation

injury.  (*Id.*).  Robinson asked Thacker to place her on leave without pay (LWOP) status until further notice.  (*Id.*).  Robinson later put this request in a memo.  This memo instructed Thacker not to contact Robinson's physician but instead to call the Department of Labor with any questions.  (*Id.*).  A doctor's note was attached to the memo stating that Robinson was "off work until further notice."  (*Id.*).

Based on advice from Labor Relations, Thacker placed Robinson on AWOL status starting June 12, 2001.  (Docket Entry No. 36, Ex. 10, Testimony of Kathleen Thacker at EEOC hearing at 167:10-168:21).  On June 26, Thacker notified Robinson of her AWOL status by letter and attached a form for a physician to complete to provide the necessary documentation for LWOP status.  (Docket Entry No. 36, Ex. 11).  Robinson maintains that she never received a letter that notified her she was being placed on AWOL status.  (Docket Entry No. 39, at 6-7).  The letter was returned to sender on July 5, 2001, marked as "Refused 6-28-01."  (Docket Entry No. 36, Ex. 11).

In late June, Thacker spoke with Deborah Corbin at OWCP about Robinson's worker's compensation injury and status.  Corbin suggested that Thacker send her an e-mail with the information and questions Thacker had about Robinson's worker's compensation status.  In a June 20, 2001 e-mail, Thacker stated that she did not know what injury Robinson was referring to when she had announced on June 13 that she would be off work "until further notice."  (Docket Entry No. 39, Ex. 4).  Robinson did not report that she had injured herself or aggravated a prior injury.  (Docket Entry No. 36, Ex. 9, Thacker Affidavit at 4).  The phone call from Robinson's mother on June 11 and the voicemail message from

Robinson on June 12 did not mention that Robinson had been hurt or reinjured.  (Docket Entry No. 39, Ex. 4).  Thacker  informed Corbin that she had placed Robinson on AWOL status since June 12 because Robinson had not provided either sufficient information or sufficient medical documentation about the reason for her absence.  (*Id.*).

Thacker knew that Robinson was on an OWCP plan that limited her to working four hours a day.  Thacker did not have information about the injury that had led to Robinson's 1994 OWCP or about why Robinson had placed herself on an indefinite leave based on that injury in June 2001.  Thacker suggested that "someone medically certified get current medical documentation on Ms. Robinson and her rehabilitative treatment and then come here to observe Ms. Robinson in her work environment." (Docket Entry No. 39, Ex. 4).  Thacker stated that to her "un-trained eye" she did not see outward indications that Robinson had an injury limiting her ability to work a full day.  Robinson had "never indicated through her actions that she has an impediment that bothers her.  She stands for extended periods, sits, bends and does her job while she's here just like everyone else."  (*Id.*).

In this lawsuit, Robinson asserts that Thacker's contact with Corbin contributed to a hostile work environment and was discriminatory.  (Docket Entry No. 39, at 24).  Robinson asserts that Thacker's contact with OWCP was harassment and discrimination because Robinson had "decided it was in her own Best interest to keep her medical information private and not authorities release to Defendant."  (*Id.*).  Robinson alleges that the following statements in Thacker's June 20 e-mail evidence harassment and discrimination: "Sandra comes to work most days carrying a large stuffed briefcase. . . . Someone who would have

11

back or shoulder problems is able to carry this?  . . . Sandra dresses very fashionably.  This includes wearing a variety of shoes, including heels that can be extremely high.  This is in someone who has back problems."  (Docket Entry No. 39, Ex. 4).  Thacker asserts that she wanted information about why Robinson had to be on indefinite leave because of an old worker's compensation injury.  At the EEOC hearing, Thacker testified that she included these statements as examples of the absence of any outward indication of an injury that would limit Robinson's ability to work without a four-hour workday restriction.  (Docket Entry No. 36, Ex. 10, Testimony of Kathleen Thacker at EEOC hearing at 235:6-25).

Robinson returned to work on July 13, 2001.  On July 23, 2001, Thacker issued Robinson a third written memorandum of counseling.  This memo stated that Robinson was on AWOL status for June 12 because she had not followed directions for requesting time off.  Robinson was on AWOL status for June 13 to July 13 as well.  (Docket Entry No. 36, Ex. 16).  The memo stated that Thacker had sent Robinson written notification of her AWOL status for June 13 to July 13 but the letter had been returned as refused mail.  (*Id.*).  The memo also stated that the medical documentation Robinson had provided was insufficient for Thacker to determine whether she should change Robinson's AWOL status for June 13 to July 13 to LWOP status.  (*Id.*).  The memo stated that if Robinson provided the appropriate physician documentation, the AWOL charge would be reversed.  (*Id.*).  The memo also stated that Robinson's failure to provide the information would result in the AWOL charges remaining and could result in further disciplinary actions.  Thacker attached to the memo copies of the documentation the physician needed to complete.  (*Id.*).

12

Robinson maintains that she did not receive or refuse the July 23 memorandum of counseling. She explains that she might not have been home and that if someone else had been there, they may have said they were not signing for the letter. Robinson explained that she could not "make people sign For official documents if they don't want to." (Docket Entry No. 39, at 12).

On August 2, 2001, Robinson received an AWOL charge for 15 minutes for reporting to work late. (Docket Entry No. 36, Ex. 3 at 4). On August 13, 2001, Robinson arrived to work 45 minutes late, without notifying her manager in advance. (*Id.*). Robinson asked to leave work 15 minutes early, explaining that she would take one hour of leave to cover the missed time. Thacker denied the request for an hour of leave time because Robinson did not make it until after she had missed the work time. Robinson then said that she was sick and was leaving immediately. (Docket Entry No. 39, at 7). A heated exchange occurred between Robinson and Thacker.

Thacker told Robinson to bring medical documentation of her illness when she returned to work. (Docket Entry No. 36, Ex. 3 at 4). Robinson claims that instead of politely requesting the medical documentation, Thacker yelled "you better bring me a doctor's statement or I'm giving you AWOL." (Docket Entry No. 39, at 21). Robinson claims that Thacker continued to shout this statement repeatedly in front of other employees and managers. (*Id.*). According to Robinson, when Thacker saw Beverly Bennett, another manager, and her employees in the hallway, Thacker yelled "I'm giving Sandra AWOL and she's going home ill!" (*Id.*)

13

Thacker disputes Robinson's account.  Thacker testified before the EEOC that she denied Robinson's request for an hour of leave time because the office was very busy and she was needed until 4:30.  (Docket Entry No. 36, Ex. 10, Testimony of Kathleen Thacker at EEOC Hearing at 146:3-8).  Robinson then said that she was going to leave immediately because she was ill and would take three hours of sick time.  (*Id.*, at 146:9-12).  Thacker responded – without raising her voice – that Robinson needed to bring a doctor's excuse when she returned to work.  (*Id.,* at 146:20-24).  During this conversation, Robinson was walking to the front of the office.  The two women ended up in front of Bennett's office. (*Id.*).  Because Thacker was still a relatively new manager, she asked Bennett to confirm that Robinson needed medical documentation, such as a doctor's note, to receive sick leave.  (*Id.*, at 146:25-147:3).  Thacker and Robinson agree that Robinson became very upset and shouted at Thacker not to discuss her personal business with anyone else.  (*Id.*).  Robinson asserts that by asking Bennett this question in the hallway, Thacker was improperly discussing private information in front of and with other employees, another harassing and discriminatory act. (Docket Entry No. 39, at 2, Ex. 7).

Robinson went into Bennett's office and told her that things were about to "get bad" and she did not want Bennett involved.  (*Id.*).  While Robinson and Bennett were talking, Robinson was told that her mother was on the telephone and wanted to know whether to call 911 or come pick Robinson up herself.  (Docket Entry No. 36, Ex. 3 at 4).  Robinson said to call 911 and request an ambulance because her blood pressure was high.  (*Id.*).  About 15 minutes later, paramedics arrived and placed Robinson on a stretcher.  According to

Robinson, Thacker told Bennett that she was going to tell Robinson she needed a doctor's statement, and Bennett advised Thacker against it. (Docket Entry No. 39, at 21). Robinson asserts that Thacker had intended to "interfere with . . . medical care," which was another "hostile act." (*Id.*).

Robinson was transported by ambulance to Northwest Memorial Medical Center on August 13. (Docket Entry No. 39, at 8). She called in sick on August 14, 15, and 16. On August 16, Thacker sent a letter instructing Robinson to have her doctor submit specific medical documentation to avoid AWOL status. (Docket Entry No. 36, Ex. 12). Robinson did submit medical documentation for the time she missed from August 14 to 16. The AWOL charge she incurred for that absence was reversed and the missed time was changed to approved leave. (*Id.*). Robinson received another AWOL charge for calling in to report that she would not be at work on August 21 after her tour of duty had already begun. (Docket Entry No. 36, Ex. 3 at 5).

On September 7, 2001, Son, Thacker's supervisor and Robinson's second-level supervisor, issued Robinson a letter of official reprimand. The letter stated that Robinson had failed to comply with Thacker's instructions, failed to follow leave procedures, and generally disrupted the workplace. (Docket Entry No. 36, Ex. 17). The letter cited the May 24, June 7, August 2, and August 13 incidents. (*Id.*). That same day, Thacker issued Robinson a leave restriction letter stating that Robinson had taken 28 hours of sick leave and 24 hours of annual leave in lieu of sick leave for the period from February 11, 2001 to August 17, 2001. (Docket Entry No. 36, Ex. 18). Robinson was placed on leave restriction

as of September 7, 2001.  (*Id.*).  Leave restriction requires an employee to follow strict procedures for requesting sick leave and other leave time.  (*Id.*).

On September 21, 2001, Thacker gave Robinson her mid-year performance evaluation.  Robinson failed most of the critical elements affecting her job performance. (Docket Entry No. 36, Ex. 19).  The evaluation cites locking office doors against customers, failing to contact management to resolve staffing issues, and other aspects of timely and proper job performance.  Robinson refused to sign the review.  In this lawsuit, Robinson asserts that the mid-year evaluation "was more retaliation for all the discrimination and hostile Environment Plaintiff endured while working for Defendant." (Docket Entry No. 39 at 25).

On December 4, 2001, Robinson filed complaint number TD 02-2067T with the Treasury Department.  (Docket Entry No. 36, Ex. 1).  Robinson alleged that she was subjected to a hostile work environment based on her race and disability.  Robinson identified the following grounds for alleging a hostile work environment:  managements' verbal abuse; AWOL status since June 2001; the memoranda of counseling; the letter of official reprimand; placement on leave restriction; and the unfavorable mid-year assessment. (*Id.*).

Robinson filed a Notice of Recurrence with OWCP on December 7, 2001.  She requested worker's compensation benefits as a result of time missed in June and July due to a claimed recurrence of the disability related to the 1994 injury to her back and left shoulder. (Docket Entry No. 36, Ex. 13).  The issue before the OWCP was whether there was sufficient

evidence "to establish that a recurrence of disability as of June 12, 2001 through July 16, 2001, and November 30, 2001-continuing are causally related to January 14, 1994 work-related injury." (*Id.*). Robinson had the burden of proving the causal relationship by reliable, substantial, and probative evidence, including medical opinion evidence and all information requested by OWCP. (*Id.*). Robinson provided disability certificates and medical reports from her physician from June 12, 2001 through December 18, 2001, and the results of diagnostic testing such as X-rays and an MRI taken November 15, 2001. OWCP denied Robinson's claim on February 15, 2002 because she "failed to provide a detailed and well-rationalized medical opinion from [her] physician" concerning her back condition and its relationship to her job duties. (*Id.*). Although Robinson provided a medical opinion that she had a herniated disk, the medical opinion did not "identif[y] which factors of [Robinson's] limited duty position have contributed to [the] recurrence of symptoms and associated disability," but rather was limited to reporting Robinson's physical complaints and examination findings. (*Id.*). A lumbar MRI performed in November 1994 did not show a herniated disk, and there was no evidence of a relationship between the herniated disk diagnosis in 2001 and the 1994 injury. (*Id.*). The evidence was insufficient to support that the claimed recurrence and associated lost wages were causally related to Robinson's 1994 work-related injury. Moreover, OWCP found no recurrence of disability because "there was no rationalized medical opinion supported by objective findings as to whether and how [Robinson's back and shoulder condition] had worsened; thus, precluding [Robinson] from performing [her] limited duties as Modified Contact Representative." (*Id.*).

17

Robinson was placed on a 30-day suspension to begin on April 6, 2002.  On April 5, 2002, Robinson filed a new complaint, TD 02-4147MT, alleging that the 30-day suspension by management was based on retaliation and discrimination on the basis of race and disability.  (Docket Entry No. 36, Ex. 4).  Robinson's complaint was considered a mixed-case complaint because it involved discrimination claims related to or stemming from an action that could be appealed to the Merit Systems Protection Board (MSPB).  Such actions include both suspension and removal.   In June 2002, the Treasury Department reorganized Robinson's claims into two complaints, TD 02-2067T and TD 02-4147MT.[1]  (*Id.*).  The first, TD 02-2067T, consisted of Robinson's allegations of verbal abuse and the mid-year assessment as discrimination based on race and disability.  (*Id.*).  The second, TD 02-4147MT ultimately contained six claims of discrimination and retaliation, including: the AWOL charges; the memoranda of counseling; the letter of reprimand; the leave restriction; and the 30-day suspension.  (*Id.*).

On August 1, 2002, Robinson added removal from her job to this second complaint, alleging discrimination and retaliation.  (*Id.*).  The record shows that the removal was based on Robinson's failure to report to work for the twenty hours per week that she was scheduled to work during the period February 18, 2002 through June 7, 2002.  (Docket Entry No. 36, Ex. 21).

The initial investigations into both complaints were completed in October 2002.

---

[1]

"T" means that the complaint was transferred for processing from one Treasury Complaint Center to another for processing.  "M" means that it was a mixed case.

(Docket Entry No. 36, Ex. 4).  Because TD 02-4147MT was a mixed case, it was sent to the Treasury Department for issuance of a final agency decision without a hearing.  (*Id.*).  The final agency decision found no discrimination in any of the six claims in TD 02-4147MT. Robinson appealed this decision to the MSPB.  (Docket Entry No. 36, Ex. 7).  The MSPB dismissed four of the claims and scheduled hearings for two, the claims based on the 30-day suspension and on the job termination.  The Treasury Department bifurcated the six claims. (*Id.*).  As of July 2003, the termination and 30-day suspension claims retained the 02-4147MT designation, while the four dismissed claims (AWOL, memoranda of counseling, official reprimand, and leave restriction) were sent to the EEOC, which had previously received the verbal abuse and mid-year assessment claims in TD 02-2067T. Robinson had requested an investigation of her EEOC claims under the number TD 02-4308T.  (*Id.*).

On receiving the four claims dismissed by the MSPB, the EEOC scheduled a hearing on all Robinson's complaints.  (Docket Entry No. 36, Ex. 7).  The hearing addressed Robinson's complaints concerning verbal abuse and the mid-year assessment from TD 02-2067T and the four complaints dismissed by the MSPB under the designation 02-4308T. (*Id.*).

On July 14, 2003, the MSPB issued an initial decision sustaining Robinson's termination.  (Docket Entry No. 36, Ex. 21).  After this decision became final, Robinson appealed it to the United States Court of Appeals for the Federal Circuit under 28 U.S.C. § 1295(a)(9), which grants that court exclusive jurisdiction over MSPB decisions.  (*Id.*).  On

April 7, 2005, the Federal Circuit affirmed the MSPB's final decision upholding Robinson's termination.  (*Id.*).

On October 4, 2004, an administrative judge issued a decision finding no discrimination or retaliation on the six claims sent to the EEOC in July 2003.[2]  (Docket Entry No. 36, Ex. 3).  The Department of Treasury reviewed this decision and issued its final order on November 2, 2004.  (Docket Entry No. 36, Ex. 4).  On July 19, 2006, the EEOC's Office of Federal Operations (EEOC OFO) accepted an appeal by Robinson and affirmed the Treasury Department's final order.  (Docket Entry No. 36, Ex. 5).  Robinson could have filed a civil action within 30 days.  Instead, she pursued an administrative appeal by asking the EEOC OFO to reconsider its decision.  (Docket Entry No. 36, Ex. 6).  After reviewing the record and its decision, the EEOC OFO denied reconsideration of the decision.  (*Id.*). Robinson then filed this suit.

In this suit, Robinson alleged discrimination and a hostile work environment based on race and color.  She alleged that verbal abuse, the AWOL charges, the memoranda of counseling, the letter of official reprimand, the leave restriction, and the mid-year assessment, were discriminatory and created a hostile work environment.  (Docket Entry No. 1).  Robinson attached a copy of her September 11, 2001 EEOC complaint that also alleged

---

[2]

In the EEOC proceedings, the administrative judge found Robinson had failed to establish a *prima facie* case of retaliation because there was no evidence that any of Robinson's supervisors knew about her 1994 EEO activity.  (Docket Entry No. 36, Ex. 3 at 10-11).  The administrative judge also found that even assuming Robinson established a *prima facie* case of retaliation, the IRS had articulated legitimate nonretaliatory reasons for its actions, and Robinson had failed to make a showing that these reasons were a pretext for retaliation.  (*Id.* at 11).

discrimination based on disability.  The EEOC decisions addressed and rejected her allegations of discrimination on the basis of race, disability, and retaliation for her 1994 EEO activity, as well as a hostile work environment, finding no basis for any of the allegations.

After discovery, the defendant moved to dismiss some of the claims for lack of subject-matter jurisdiction and sought summary judgment on other claims.  Robinson has responded.  The parties have filed extensive summary judgment evidence.

Robinson is proceeding *pro se*.  Courts apply "less stringent standards to parties proceeding *pro se* than to parties represented by counsel and liberally construe the briefs of pro se litigants." *Sanders v. Barnhart*, 105 Fed. Appx. 535, 536 (5th Cir.2004) (citing *Grant v. Cuellari*, 59 F.3d 523, 524 (5th Cir.1995); *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir.1993)).

The motions and responses are addressed below.

### III.    The Motion to Dismiss for Lack of Subject-Matter Jurisdiction

#### A.    The Legal Standard

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject matter jurisdiction.  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir.1998).  The plaintiff bears the burden of demonstrating that subject matter jurisdiction exists.  *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir.1981).  "Courts may dismiss for lack of subject matter jurisdiction on any one of three bases: (1) the complaint alone; (2) the complaint

supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir.1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981)).

When examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1), which does not implicate the merits of a plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir.1997); *see also Clark*, 798 F.2d at 741. When a party challenges the allegations supporting subject-matter jurisdiction, the court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts. In such instances, a court's reference to evidence outside the pleadings does not convert the motion to dismiss to a Rule 56 motion for summary judgment. Accordingly, the court may consider matters outside the pleadings, such as testimony and affidavits, to resolve a factual challenge to subject matter jurisdiction, without converting the motion to dismiss to one for summary judgment. *See Garcia*, 104 F.3d at 1261.

**B.    The Motion to Dismiss the Hostile Work Environment Claims for Failure to Exhaust**

As a precondition to filing suit in federal court, Title VII requires a federal employee claiming discrimination to exhaust his or her administrative remedies. 42 U.S.C. § 2000e *et seq.*; *Randel v. U.S. Dept. of Navy*, 157 F.3d 392, 395 (5th Cir. 1998). If the plaintiff fails

to exhaust his administrative remedies, the district court lacks jurisdiction to entertain the lawsuit. *Id.* Title VII actions filed in federal court by federal employees must be filed within the time allotted by Title VII and the plaintiff must first have exhausted her administrative remedies. *See Tolbert v. United States*, 916 F.2d 245, 247-48 (5th Cir. 1990). When a complainant pursues EEOC review of an initial agency determination, the complainant must exhaust that avenue before bringing a civil action. *See Tolbert*, 916 F.2d at 247; *White v. Frank,* 895 F.2d 243, 244 (5th Cir. 1990). The statutory language provides the time frame in which a complainant can file a civil action in federal court. 42 U.S.C. § 2000e-16(c). Timely filing and exhaustion are jurisdictional requirements. *See, e.g., Brown v. Dept. of Army*, 854 F.2d 77, 78 (5th Cir. 1988); *Porter v. Adams*, 639 F.2d 273, 276 (5th Cir. 1981).

Robinson's initial complaints with the Treasury Department alleged a racially hostile work environment. (Docket Entry No. 36, Ex. 1). When the MSPB dismissed the claims of hostile work environment after administrative appeal, Robinson requested a hearing on those claims with the EEOC. (Docket Entry No. 36, Ex. 4). When the MSPB dismisses a mixed-case appeal, the case can be transferred to the EEOC. *See* 29 C.F.R. § 1614.302 (b). The EEOC consolidated the claims that the MSPB dismissed with the other claims Robinson had already filed with the EEOC. (Docket Entry No. 36, Ex. 4). These other claims alleged race and disability discrimination and retaliation based on verbal abuse and the AWOL charges, memoranda of counseling, official reprimand, leave restriction, and failing mid-year assessment. (Docket Entry No. 36, Ex. 3).

The EEOC issued a final order finding no discrimination based on race, disability, or

23

retaliation and finding that the record was insufficient to support a hostile work environment claim.  *Id.*  Robinson appealed to the EEOC OFO, which affirmed the EEOC's order.  (Docket Entry No. 36, Ex. 5).  Robinson filed a timely administrative appeal.  The EEOC OFO denied reconsideration on September 15, 2006.  (Docket Entry No. 36, Ex. 6).  This denial represented the final EEOC decision.  There was "no further right of administrative appeal."  *Id.*  At this point, Robinson had exhausted her administrative recourse.  She had 180 days after receiving notice of the final agency decision to file suit in federal district court.  29 C.F.R. § 1613.421(d).

The defendant relies on *Hampton v. IRS*, 913 F.2d 180, 182 (5th Cir. 1990), to support its argument that Robinson did not exhaust her administrative remedies with respect to her hostile work-environment claims.  (Docket Entry No. 36 at 8).  The *Hampton* court noted that the MSPB and the EEOC provide two administrative routes through which a complainant can allege discrimination.  In *Hampton*, the plaintiff had not pursued either administrative path before seeking a judicial remedy.  *See id.* at 182.  In contrast, Robinson exhausted the administrative remedies available to her for her hostile work environment claim when the EEOC OFO denied reconsideration.  Robinson filed the present action within 180 days of that denial.  (Docket Entry No. 1, December 15, 2006).

The defendant's motion to dismiss Robinson's hostile work environment claims for lack of subject-matter jurisdiction due to failure to exhaust is denied.

C.      **The Motion to Dismiss Certain Claims for Failure to Meet Jurisdictional Time Requirements**

Robinson bases her hostile work environment and discrimination claims on allegations that management verbally abused her from May 24, 2001 through November 29, 2001; charged her with AWOL starting in June 2001; issued her memoranda of counseling on June 6, June 7, and July 23 of 2001; issued a letter of official reprimand on September 7, 2001; placed her on leave restriction on September 7, 2001; and issued her a failing mid-year assessment on September 21, 2001.  (Docket Entry No. 1).  The defendant asserts that three of these claims – for verbal abuse, AWOL status, and the memoranda of counseling – are barred because Robinson did not initiate contact with "a Counselor within 45 days of the date of the matter alleged to be discriminatory."  29 C.F.R. § 1614.105(a)(1).  Robinson asserts that these claims are not discrete and separate but instead part of a continuing violation that is not subject to the statutory time bar.

A Title VII plaintiff may not recover for discrete acts of discrimination that occur outside the statutory time period.  The Supreme Court has recognized that "hostile environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct" that "occurs over a series of days or perhaps years."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  The Fifth Circuit has identified discrete acts as those that are actionable in themselves, such as termination, failure to promote, denial of transfer, or refusal to hire.  *See Newton v. Securitas Security Servs., USA, Inc.*, No. 07-10472, 2007 WL 2908651, at *2 (5th Cir. Oct.3, 2007).  When a hostile work

25

environment claim involves acts of harassment that may not be actionable considered separately but contribute to cause a hostile environment over days or even years, the "continuing violation" theory applies. *Morgan*, 536 U.S. at 115 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Under the continuing violation theory, a plaintiff does not have to show that all the offensive conduct occurred within the limitations period. Instead, the plaintiff may show discrimination through a series of related acts if one or more of them falls within the limitations period. *Id.; see also Pegram v. Honeywell, Inc*., 361 F.3d 272, 279-80 (5th Cir.2004).

Equitable considerations are at the core of the continuing violation theory. The statutory time period begins to run when "facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably prudent person similarly situated." *See Glass v. Petro-Tex Chem. Corp.*, 757 F.2d 1554, 1560-61 (5th Cir.1985). The inquiry is focused on what events or instances would place a reasonable person on notice that her rights have been violated. *Id*. The continuing violation theory acts to "accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all of the discriminated acts committed as part of this pattern or policy can be considered timely." *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir.2001).

There is no definitive standard for what constitutes a "continuing violation." *See Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998). In examining whether a plaintiff has alleged facts supporting a continuing violation, a court considers the nature of the alleged

acts, the frequency of the acts, and whether the acts have a "degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate." *Id.* at 239.   A one-time employment event, such as a failure to hire, promote, or train, is a discrete action that should place an employee on notice that a cause of action has accrued. *Morgan*, 536 U.S. at 113.   A "plaintiff must demonstrate more than a series of discriminatory acts . . . [she] must show an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *Id.*  (internal citations omitted).

The factors outlined in *Morgan* and *Huckabay* lead to the conclusion that Robinson did not merely allege a series of discrete, separately actionable events or occurrences.   The alleged verbal abuse, placement on AWOL status, and the memoranda of counseling are not discrete and separate actionable acts of harassment or discrimination.   Under Title VII, "being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions . . . because they [do] not have a material impact on the terms and conditions of Plaintiff's employment."  *Smalls v. Allstate Ins. Co.*, 396 F.Supp.2d 364, 371 (S.D.N.Y. 2005) (quoting *Lee v. New York State Dept. of Health*, Nos. 98 Civ. 5712, 99 Civ.4859, 2001 WL 34031217, at *16 (S.D.N.Y. Apr. 23, 2001)); *see also Henriquez v. Times Herald Record*, No. 97 Civ. 6176, 1997 WL 732444, at *6 (S.D.N.Y. Nov. 25, 1997) (holding that employer's request for documentation in

connection with medical leave was not "the type[ ] of tangible employment action[ ] that courts have found to be materially adverse"); *Hill v. Children's Village*, 196 F.Supp.2d 389, 397 (S.D.N.Y. 2002) (". . . plaintiff did receive a warning letter regarding her conduct . . . . However this alone is insufficient to create a tangible employment detriment.") (citations omitted); *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005) ("a letter of warning is generally considered insufficient to qualify as an adverse employment action").  Robinson has alleged that the verbal abuse, placement on AWOL status, and memoranda of counseling were followed by more serious adverse employment actions, from the same supervisor, Thacker, and that taken together the actions resulted in a hostile work environment.

The official reprimand, the leave restriction, and the failing mid-year assessment, like the first three earlier challenged actions of alleged verbal abuse, placement on AWOL status, and receiving memoranda of counseling, all dealt with Robinson's timeliness, attendance, and work performance.  Robinson's hostile work environment claim supports application of the continuing violation doctrine.  The motion to dismiss the first three alleged bases for the hostile work environment claims is denied.

### D.    The Motion to Dismiss the Claims Arising from the Job Termination

The defendant argues that subject-matter jurisdiction over Robinson's discriminatory termination cause of action is lacking because she filed this lawsuit too late and because the Federal Circuit has exclusive jurisdiction over claims appealable to the MSPB.

Robinson's claim that her job termination resulted from discrimination based on race, disability, and retaliation was part of a mixed-case complaint to the Treasury Department.

Robinson appealed the agency's finding of no discrimination to the MSPB. The MSPB affirmed. Under EEOC regulations, an individual who has received a final decision from the MSPB on a mixed-case appeal may petition the EEOC to consider that decision. 29 C.F.R. § 1614.303(a). The EEOC determines whether the MSPB decision on discrimination is based on a correct interpretation of any applicable law, rule, or regulation and is supported by the evidence in the record as a whole. 29 C.F.R. § 1614.305(c).

On September 3, 2004, Robinson filed a petition with the EEOC requesting review of the MSPB's decision that her termination was not discriminatory. (Docket Entry No. 36, Ex. 22). On October 12, 2004, the EEOC OFO issued a decision concurring with the MSPB decision finding no discrimination. (*Id.*). The 2004 EEOC OFO decision stated that Robinson had 30 days after the MSPB's decision upholding her job termination in which to file a civil action in federal district court challenging that termination. (*Id.*). Robinson did not file this suit until December 15, 2006.

Robinson did appeal the MSPB's determination that the job termination was not discriminatory to the United States Court of Appeals for the Federal Circuit. Title 5 U.S.C. § 7703(a)(1) provides that "[a]ny employee or applicant for employment adversely affected or aggrieved by a final order or decision of the Merit Systems Protection Board may obtain judicial review of the order or decision." The United States Court of Appeals for the Federal Circuit has exclusive jurisdiction over such an appeal. 28 U.S.C. § 1295(a)(9); 5 U.S.C. §§ 7703(b)(1) and (d). On April 7, 2005, the Federal Circuit affirmed the MSPB's decision.

The MSPB's final decision upholding Robinson's termination from her position was

reviewed by the Federal Circuit Court of Appeals, which has exclusive jurisdiction over appeals from MSPB decisions.  This court lacks subject-matter jurisdiction over Robinson's claims arising from her job termination.  The defendant's motion to dismiss those claims is granted.

## III.    The Motion for Summary Judgment

### A.    Summary Judgment and Title VII

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the

pleadings and designate specific facts showing that there is a genuine issue for trial.  *See id.*
The nonmovant must "do more than simply show that there is some metaphysical doubt as
to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir.
1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586
(1986)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position
will be insufficient; there must be evidence on which the jury could reasonably find for the
plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).  In deciding a
summary judgment motion, the court reviews the facts drawing all reasonable inferences in
the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d
721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.

Title VII prohibits discrimination by employers "against any individual with respect
to [her] compensation, terms, conditions, or privileges of employment, because of such
individual's race, color, religion, sex, or national origin. . . ."  42 U.S.C. § 2000e-2(a).
Intentional discrimination can be proven by either direct or circumstantial evidence. *Russell
v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir. 2000).  Evidence is "direct" if it
would prove the fact in question without inference or presumption. *Fabela v. Socorro Indep.
Sch. Dist.,* 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted).  If no direct evidence exists,
the court uses the familiar burden-shifting framework created by the Supreme Court in
*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668
(1973).  Under *McDonnell Douglas,* a plaintiff alleging discrimination must first prove a
prima facie case by showing that (1) she is a member of a protected class; (2) she was

qualified for the position; (3) others similarly situated were treated more favorably.  *See id.*; *Septimus v. Univ. of Houston,* 399 F.3d 601, 609 (5th Cir. 2005).  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the challenged action.  *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.  If the defendant meets this burden, the plaintiff must then create a genuine issue of material fact that either (1) the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct and that discrimination was a motivating factor in the defendant's decision.  *See Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004); *see generally, Crawford v. U.S. Dept. of Homeland Sec*., 245 Fed.Appx. 369, 377-378 (5th Cir. 2007).  The plaintiff can meet this burden "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination."  *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005).  The United States Supreme Court, in *Reeves v. Sanderson Plumbing Prods.,* stated that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."  530 U.S. 133, 143 (2000).

The elements of a *prima facie* case of a hostile work environment are that: (1) the plaintiff belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant

knew or should have known of the harassment, yet failed to take prompt remedial action. *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir.2002).  Because Robinson alleges that she was harassed by supervisors with immediate or successively higher authority over her, she must satisfy only the first four elements.  *See Celestine,* 266 F.3d at 353-54 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

The Supreme Court has explained that in determining whether a workplace constitutes a hostile work environment, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris,* 510 U.S. at 23.  For harassment to be actionable, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *Watkins v. Texas Dept. of Criminal Justice*, 269 Fed.Appx. 457, 463-464 (5th Cir. 2008).  "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."  *Harvill v. Westward Communications LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).  The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75,

82 (1998)).

**B.     The Summary Judgment Evidence**

The relevant summary judgment evidence in the record includes the June 6[3], June 7[4],

and July 23 memoranda of counseling[5]; Thacker's June 26, 2001 letter notifying Robinson

of AWOL status[6]; Thacker's August 16, 2001 letter notifying Robinson of AWOL status[7];

an August 16, 2001 e-mail from Bennett to Thacker[8]; Robinson's Emergency Physician

Record for August 13, 2001[9]; the official reprimand from Son[10]; the leave restriction letter[11];

the failing mid-year evaluation[12]; Thacker's February 22, 2002 memorandum of counseling

to Lynda Chavez[13]; e-mail correspondence between Thacker and Corbin of OWCP[14];

OWCP's February 15, 2002 denial of worker's compensation benefits[15]; Robinson's initial

---

[3] (Docket Entry No. 36, Ex. 14).

[4] (*Id.*, Ex. 15).

[5] (*Id.*, Ex. 16).

[6] (*Id.*, Ex. 11).

[7] (*Id.*, Ex. 12).

[8] (Docket Entry No. 39, Ex. 7).

[9] (*Id.*, Ex. 10).

[10] (Docket Entry No. 36, Ex. 17).

[11] (*Id.*, Ex. 18).

[12] (*Id.*, Ex. 19).

[13] (Docket Entry No. 39, Ex. 9).

[14] (*Id.*, Ex. 4).

[15] (Docket Entry No. 36, Ex. 13).

complaint with the Treasury Department dated December 4, 2001[16]; a December 31, 2001 Treasury Department letter to Robinson concerning case 02-2067T[17]; an August 2, 2002 Treasury Department letter concerning case 02-4147MT[18]; a July 29, 2003 Treasury Department Letter concerning case 02-4147MT and 02-4308T[19]; Robinson's affidavit dated April 3, 2002[20]; Thacker's affidavit dated April 4, 2002[21]; a transcript of Kathleen Thacker's testimony on January 22, 2004 at the EEOC hearing in case 02-2067T and 02-4308T[22]; the EEOC Administrative Judge's September 21, 2004 decision finding no hostile work environment[23]; the Treasury Department's November 2, 2004 adopting the Administrative Judge's September 21, 2004 decision and issuing its final order on case 02-2067T and 02-4308T[24]; the EEOC OFO July 19, 2006 decision affirming the Treasury Department's final order[25]; the EEOC OFO's September 15, 2006 denial of Robinson's request for

---

[16] (*Id.*, Ex. 1).

[17] (*Id.*, Ex. 2).

[18] (Docket Entry No. 39, Ex. 2).

[19] (Docket Entry No. 36., Ex. 7).

[20] (*Id.*, Ex. 8).

[21] (*Id.*, Ex. 9).

[22] (*Id.*, Ex. 10).

[23] (*Id.*, Ex. 3).

[24] (*Id.*, Ex. 4).

[25] (*Id.*, Ex. 5).

reconsideration of its July 19, 2006 decision[26]; the EEOC OFO October 12, 2004 decision

concurring with the MSPB's finding of no discrimination in Robinson's termination[27]; and

the Federal Circuit's April 7, 2005 decision affirming the MSPB's decision.[28]

C.     **The Motion for Summary Judgment**

The defendant agrees that Robinson is a member of a protected class – African-

American – but contends that she cannot show the remaining elements of her *prima facie*

case of a hostile work environment.  The defendant also argues that even assuming Robinson

has made a *prima facie* showing, the defendant has met its burden of proffering a legitimate

business reason for each allegedly discriminatory action and Robinson has failed to raise a

fact issue as to pretext or as to whether her membership in a protected class was a motivating

factor.

Robinson claims that she experienced "verbal abuse" because Thacker "constantly

yelled and approached [her] confrontationally."  (Docket Entry No. 39, at 20).  Robinson

focuses on May 24, 2001, June 7, 2001, and August 13, 2001 as the basis for her assertion

of verbal harassment.  The record evidence does not support Robinson's claim that Thacker

"constantly" yelled at her without provocation.  The evidence shows that Robinson became

upset in the meetings on May 24 and June 7 when she was criticized for reporting late and

for locking the door on waiting customers during office hours.  The evidence shows that on

---

[26] (*Id.*, Ex. 6).

[27] (*Id.*, Ex. 22).

[28] (Id., Ex. 21).

August 13, 2001, Robinson became upset when she arrived late to work, wanted to leave early, was refused an hour of leave time because it was requested after the fact, stated that she was ill and asked for an ambulance to pick her up from work, was told to bring medical documentation to support her sick leave when she returned to work, and Thacker asked another manager about appropriate medical documentation.

The case law on when verbal abuse gives rise to a hostile work environment claim shows a far greater degree of abuse than the record discloses here, both in terms of the frequency and the nature of the offensive communications. *Compare Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir.2001) (finding a hostile work environment was created when a male employee was called "faggot" and "female whore" by coworkers and supervisors weekly and often several times a day); *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 817 (9th Cir.2002) (finding that a Korean plaintiff suffered harassment where the employer verbally and physically abused the plaintiff every day for nearly four years because of his race); *with Roldan v. Chertoff*, 2006 WL 4632503, at *7 (S.D. Cal. Oct. 19, 2006) (finding no hostile work environment claim when there were no more than 20 incidents of verbally hostile conduct over a 9 month period and stating that a hostile work environment predicated on words must amount to a "relentless campaign" of verbal abuse); *Perez v. Communication Workers of America*, 210 Fed. Appx. 27, 31 (2d Cir. 2006) (no hostile work environment when many instances of verbal abuse were unrelated to plaintiff's ethnic, national, or religious background and instead reflected his supervisor's dissatisfaction with his work performance); *Manatt v. Bank of America, NA*, 339 F.3d at 792, 799 (9th Cir.2003) (no

hostile work environment from coworkers' jokes that included the phrase "China Man," pulling eyes back with fingers to mock the appearance of Asians, and ridiculing the plaintiff for word mispronunciation); *Vasquez v. County of Los Angeles*, 307 F.3d 884, 893 (9th Cir. 2002) (no hostile work environment from yelling at the plaintiff employee in front of others and saying that he had "a typical Hispanic macho attitude" and that he should work in the field because "Hispanics do good in the field"); *Finnegan v. Dep't of Public Safety & Correctional Serv.*, 184 F.Supp.2d 457, 462 (D. Md. 2002) (no hostile work environment despite the plaintiff's allegation that she was verbally abused for several months because she offered few specific examples).

Taking the summary judgment evidence in the light most favorable to Robinson shows that both she and Thacker raised their voices to each other on occasion and that some of their exchanges became confrontational.  The record does not show that Thacker used derogatory or offensive terms in addressing Robinson.  The exchanges between Robinson and Thacker show clashing personalities and disagreements but not actionable harassment.  "It is a simple fact that in a workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or 'cold-shouldering' to the level of an actionable offense"; *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 564 (5th Cir. 1998); *see also McCray v. DPC Industries, Inc.*, 942 F.Supp. 288, 293 (E.D. Tex.1996) ("To establish a prima facie case of 'hostile work environment' based on race, a plaintiff must show more than he was treated badly and that he was black. . . . [A]n abusive work environment required a plaintiff to 'prove more than a few isolated incidents of racial enmity'; . . . Instead, 'there

must be a steady barrage of opprobrious racial comments'") (internal citations omitted).

Robinson also alleges that the disciplinary measures taken against her, including placement on AWOL status, receiving memoranda of counseling, and the unfavorable mid-year evaluation, were actionable harassment. The record shows that Robinson would arrive late to work without telling her manager in advance. The record shows undisputed evidence that Robinson shut the office door on waiting customers. The record shows that when Robinson told Thacker that she did not want to record time spent to stay late to finish helping customers, Thacker stated in writing that Robinson could leave at the end of her tour of duty but had to report to work on time the following day and adhere to the required procedures to take any leave time. The record shows that Robinson continued to come to work late and failed to follow the required leave procedures.

Robinson asserts that Thacker required adherence to procedures and policies that the previous managers had not followed and subjected her to closer scrutiny than was applied to others, watching to see when she reported and left work, how she took leave time, and whether she had the medical documentation necessary to obtain leave time. Generally, heightened scrutiny of an employee by a supervisor is not harassment that can support a hostile work environment claim. *See, e.g., Combs-Burge v. Rumsfeld*, 170 Fed. Appx. 856, 862 (4th Cir.2006) (unpublished) (stating that "counseling [an employee] about performance deficiencies and assigning her remedial tasks to correct those deficiencies . . . is not the type of conduct that is objectively abusive because it was the direct result of the documented shortcomings in [the employee's] job performance"); *Martinelli v. Penn Miller Ins. Co.*, 269

Fed.Appx. 226, 228 (3d Cir. 2008) (unpublished) (finding that an employer's scrutiny of an employee's work, "while unpleasant and annoying, did not create . . . [a] hostile work environment . . . ."); *Harrington v. Disney Reg'l Entm't, Inc.*, No. 06-12226, 2007 WL 3036873, at *12 (11th Cir. Oct. 19, 2007) (unpublished) (finding no hostile environment when an employer allegedly subjected the employee to unfair discipline); *Harbuck v. Teets*, 152 Fed. Appx. 846, 848 (11th Cir .2005) (unpublished) (finding no hostile work environment when the employer allegedly subjected the employee to heightened scrutiny). The alleged heightened scrutiny of Robinson by Thacker is not harassment and does not support a hostile work environment claim.

Robinson points to Thacker's treatment of Lynda Chavez, a Caucasian employee, when Chavez was late to work, to support her argument that Thacker singled Robinson out for harsher treatment for tardiness and for failure to follow the leave procedures. The record shows that Chavez had problems with timely reporting to work. In a March 5, 2002 memorandum of counseling issued to Chavez, Thacker stated:

> Since last year you have been showing a pattern in which you call in stating you are sick or running late. This has occurred as early as May 22, 01, but seems to be increasing in frequency and has become almost a weekly occurrence within the few weeks. You usually arrive between 1 to 2 hours past the start of your tour of duty. Usually there is no specific request for a type of leave you will be using when you call in.

(Docket Entry No. 39, Ex. 9). Thacker listed one day when Chavez called in sick and 22 days between May 22, 2001 and March 5, 2002 when Chavez called in late. Thacker's memorandum to Chavez further stated:

40

> You have had a negative leave balance for the last year and have
> to cover these absences by the use of annual leave or by working
> credit time. In the past, I have had a liberal credit time policy
> and approved your working credit time, even on days you have
> arrived late. We had a specific discussion on 2/14/02 in regard
> to your calling in late and the working of credit time on those
> days you do not work your full tour of duty. I am putting you on
> official notice that you will no longer be allowed to work credit
> time, except if it is approved in advance. You must also report
> the type of leave you are requesting, when you call in. Failure to
> follow these procedures may result in AWOL charges for the
> time involved.

(*Id.*).  Robinson argues that Thacker's actions toward Chavez show disparate discipline

because a memorandum of counseling was not issued for almost a year after Chavez began

calling in late, Chavez was not put on AWOL status for any of the time she missed, and

Chavez did not receive a leave restriction letter or official reprimand for consistent tardiness.

(Docket Entry No. 39, at 20).  Robinson has failed to identify or submit competent summary

judgment evidence of disparate discipline because she has not identified any basis for

showing that Chavez or other non-African-American employees were treated more favorably

under "nearly identical circumstances," *see Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086,

1090 (5th Cir.1995), and she has failed to show that she did not violate the rules governing

her work place.  An employee is "similarly situated" to the plaintiff if her circumstances "are

comparable in all material respects . . . [and] the plaintiff must usually show that the

misconduct for which [she was disciplined] was nearly identical to that engaged in by [the

other] employee" who was treated less harshly.  *Ysleta Indep. Sch. Dist. v. Monarrez,* 177

S.W.3d 915, 917-18 (Tex. 2005) (quoting *Smith v. Wal-Mart Stores, Inc.*, 891 F.2d 1177,

1180 (5th Cir. 1990)).  Chavez worked eight hours a day and accrued credit time; Robinson

41

only worked four hours a day and did not accrue credit time.  Unlike Robinson, Chavez used credit time to make up for reporting late.  Robinson used leave time, which requires documentation that she often failed to provide.  In addition, Chavez was disciplined for taking excessive leave and there is no showing that the discipline failed to improve her performance.  By contrast, even after disciplinary measures, Robinson continued to violate the work rules on timely reporting and on providing medical documentation and following certain procedures for leave.  Robinson received progressive discipline, beginning with two memoranda of counseling in June 2001, a letter of reprimand and leave restriction in September 2001, and a failing mid-year assessment in late September 2001.  The record shows that she continued to violate the work rules.  The record does not show any non-African-American employee without credit time who repeatedly reported to work late or refused to provide proper documentation and follow proper procedures, yet who was not charged with AWOL status or issued a memorandum of counseling or given poor performance assessments.

Robinson has not made the necessary showing that the acts she complains of were based on her membership in a protected class or that they were sufficiently severe or pervasive to alter the conditions of her employment and create a hostile working environment.  *See, e.g., Schultze v. White*, 127 Fed. Appx. 212, 217-18 (7th Cir. 2005) (unpublished) (plaintiff in sex harassment case did not show she was subject to hostile work environment despite evidence of heightened monitoring and close scrutiny of her job performance, sexually derogatory comments, and unequal discipline based on sex); *see also*

*Boyd v. Presbyterian Hosp.*, 160 F.Supp.2d 522, 541-42 (S.D.N.Y. 2001) (holding that while an African-American nurse was subjected to gossip, lower performance evaluation, and intense scrutiny of her work performance that were annoying, bothersome, and stress-inducing, they did not create a racially hostile work environment); *Padilla v. Carrier Air Conditioning*, 67 F.Supp.2d 650, 661 (E.D. Tex. 1999) (holding that close scrutiny of plaintiff's work combined with employer's slanderous remarks were insufficient to establish racial harassment).  The nature and frequency of the incidents Robinson complains of fall short of the level the cases require to raise a fact issue as to whether there was harassing conduct sufficiently severe or pervasive to affect working conditions.  *Compare Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, ----, 2007 WL 122003, at *7 (5th Cir. Jan.19, 2007) (holding that supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not rise to the level of severe or pervasive); *and Septimus*, 399 F.3d at 612 (holding that one two-hour "harangue" by a supervisor, that supervisor's use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old girlfriend" did not amount to a severe or pervasive working environment); *with Harvill*, 433 F.3d at 435-36 (holding that district court erred in not finding a fact issue as to whether repeated groping, kissing, and fondling of plaintiff's breasts and buttocks, and lewd comments about her sex life during a seven-month period was severe or pervasive); and *Walker v. Thompson*, 214 F.3d 615, 619-22 (5th Cir. 2000) (holding that a hostile work environment claim survived because the evidence showed that the plaintiff was subjected to years of racially offensive disparaging

comments made to and about her.).  Alleged acts of disparate treatment cannot be transformed, without more, into a hostile work environment claim. *See, e.g., Lester v. Natsios*, 290 F.Supp.2d 11, 33 (D. D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."); *Parker v. State, Dep't of Public Safety*, 11 F.Supp.2d 467, 475 (D. Del. 1998) (stating that "the dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address.").

Even assuming that Robinson had made a *prima facie* showing of discrimination or a hostile work environment based on race or color, the defendant has presented legitimate, nondiscriminatory reasons for the employment actions Robinson challenges and she has failed to raise a fact issue as to whether the defendant's reasons were not true but instead a pretext for discrimination or that the defendant's reasons, while true, were only one of the reasons for its conduct and that discrimination was a motivating factor.  As explained above, the record shows that Robinson repeatedly violated work rules about timely reporting and taking leave.  The record does not show that Robinson was singled out for harsher treatment than similarly situated employees outside the protected class.  Robinson's discrimination claims fail as a matter of law.

Robinson argues that her hostile work environment and discrimination claims based

on disability should survive summary judgment because she "filed for discrimination based on disability and Defendant did not file a summary judgment for that issue." (Docket Entry No. 39, at 25). Robinson's complaint in this civil action did not specifically allege hostile work environment or discrimination based on disability. (Docket Entry No. 1). The defendant moved for summary judgment on the basis that its reasons for the challenged employment actions were legitimate and nondiscriminatory. Robinson's response addressed all aspects of the defendant's and her own conduct relevant to both discrimination and hostile work environment claims based on race and disability. The record includes the administrative finding that Robinson was not disabled during the relevant period in 2001 and 2002. There is no evidence in the summary judgment record that the actions Robinson alleged as the basis for her hostile work environment or discrimination claims were the result of any disability, real or perceived. For the same reasons that led to the grant of summary judgment as to Robinson's race-based claims, the claims of discrimination and hostile work environment based on disability fail as a matter of law.[29]

---

[29]

Robinson's complaint did not allege retaliation. The EEOC proceedings dealt with Robinson's retaliation claim and ultimately found no retaliation. (Docket Entry No. 36, Exs. 3, 5, 6). The administrative judge found Robinson had failed to establish a *prima facie* case of retaliation because there was no evidence that any of Robinson's supervisors knew about her 1994 EEO activity. (Docket Entry No. 36, Ex. 3 at 10-11). The administrative judge also found that even assuming Robinson established a *prima facie* case of retaliation, the IRS had articulated legitimate nonretaliatory reasons for its actions, and Robinson failed to demonstrate that these reasons were a pretext for discrimination. (*Id.* at 11).

In response to defendant's motion for summary judgment, Robinson stated that she filed this action based on race, color, and disability. (Docket Entry No. 39, at 13). She did not mention retaliation other than to say that the mid-year evaluation was "more retaliation for the discrimination and hostile Environment Plaintiff endured while working for Defendant." (*Id.,* at 25).

A plaintiff establishes a *prima facie* case of retaliation by showing: (1) that she engaged in activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that there

45

**IV.     Conclusion**

Robinson exhausted her administrative remedies concerning her hostile work environment claims and the defendant's motion to dismiss those claims is denied.  This court lacks subject-matter jurisdiction over Robinson's termination claims and grants the defendant's motion to dismiss as to those claims.  Robinson's hostile work environment and discrimination claims fail as a matter of law and the  defendant's motion for summary judgment on those claims is granted.

Final judgment is entered by separate order.

SIGNED on October 22, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

was a causal connection between the participation in the protected activity and the adverse employment decision. *See Shirley v. Chrysler First Inc.*, 970 F.2d 39, 42 (5th Cir.1992).  A "causal link" is established when the evidence shows that "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir.2001). The proffered evidence must be sufficient to permit a reasonable fact finder to conclude that the decision maker had actual knowledge of the protected activity.  *Amie v. El Paso Indep. Sch. Dist.*, 253 Fed. Appx. 447, 455 (5th Cir. 2007).  There is no evidence that Thacker or Son knew about Robinson's 1994 EEO activity when the actions Robinson complained of were taken.  Thacker became Robinson's manager in January 2001 after transferring from Florida to Houston.  Thacker stated in her affidavit that Robinson did not have documentation of EEO issues on file in the Houston office and that Thacker "[did] not know of any prior EEO complaints filed by Ms. Robinson."  (Docket Entry No. 36, Ex. 8, Thacker Affidavit at 1).  Son did not become aware of Robinson's prior EEO activity until June 28, 2002.  (Docket Entry No. 36, Ex. 3 at 10).